# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                   No. CR 15-2218 JB

ARTHUR HERLIHY,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Objections to Presentence Investigation Report and Request for Evidentiary Hearing, filed July 6, 2017 (Doc. 52)("Objections"). The Court held a sentencing hearing on August 11, 2017. The primary issues are: (i) whether the $16.5 million New Mexico Finance Authority ("NMFA") loan to improve and renovate a truck stop, and the $5.5 million Ponzi scheme to defraud individual investors in October, 2009, are relevant conduct for the convicted offense -- making a false statement to a bank, 18 U.S.C. § 1014 -- under the United States Sentencing Guidelines Manual § 1B1.3, at 22 (U.S. Sentencing Comm'n 2009)("U.S.S.G." or "Guidelines")[1] and whether the Presentence Investigation Report ¶ 11, at 4,

---

[1]The Supreme Court of the United States of America held, in <u>Peugh v. United States</u>, 569 U.S. 530 (2013):

> District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described. The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes.

569 U.S. at 549 (emphasis in original). Because the 2009 Guidelines were in effect at the time of Herlihy's crime, the Court uses the 2009 Guidelines to calculate Herlihy's sentencing range and

filed May 1, 2017 (Doc. 46)("PSR") should describe this conduct; (ii) whether the PSR's narrative portions mischaracterize a loan from Maurice Bonal as going to Defendant Arthur Herlihy personally rather than going to Fuel 4 Less, a limited liability company that was the majority owner (99%) of Savoy Travel Center; (iii) whether the Court should remove adjustments to Herlihy's total offense level pursuant to conduct arising from the NMFA loan and the Ponzi scheme to defraud individual investors, reducing Herlihy's total offense level to 5, see PSR ¶¶ 65-74, at 14-15; (iv) whether the Court should remove portions of the PSR section on Factors That May Warrant a Sentence Outside of the Advisory Guideline System that deal with the NMFA loan or the Ponzi scheme to defraud individual investors, see PSR ¶ 124, at 26; (v) whether the Court should impose community service in place of a fine, see PSR ¶ 104, at 24; (vi) whether the special condition of supervision dealing with credit charges is vague and/or unnecessary,[2] see Attachment A to the Presentence Report at 2, filed May 1, 2017 (Doc. 46-1)("Conditions of Supervision"); and (vii) whether the special condition of supervision dealing with teaching is vague or unnecessary,[3] see Conditions of Supervision at 2. The Court concludes that: (i) the NMFA loan and the Ponzi scheme to defraud individual investors are not relevant conduct for the convicted offense; therefore, the Court will sustain Herlihy's Objections and not consider these crimes as relevant conduct for sentencing purposes; (ii) the PSR's narrative describing Bonal's loan does not suggest that the loan

---

not the current version.

[2]The special condition reads: "You must not incur new credit charges, negotiate or consummate any financial contracts or open additional lines of credit without prior approval of the probation officer." Conditions of Supervision at 2.

[3]The special condition reads: "You must seek approval from the Court regarding employment that involves financial advising or teaching." Conditions of Supervision at 2.

was for Herlihy personally; therefore, the Court overrules Herlihy's Objections to the inclusions of these portions of the PSR; (iii) having sustained Herlihy's Objections to the NMFA loan and the Ponzi scheme to defraud individual investors being relevant conduct to the convicted offense, the Court will sustain Herlihy's Objections to the adjustments to Herlihy's total offense level that are based on this conduct; (iv) the Court will not sustain Herlihy's Objections to the portions of the PSR section on Factors That May Warrant a Sentence Outside of the Advisory Guideline System that deal with the NMFA loan or the Ponzi scheme to defraud individual investors; (v) the Court will sustain Herlihy's Objection to the imposition of a fine; (vi) the Court will sustain Herlihy's Objection to the special condition of supervision dealing with credit charges and the special condition of supervision dealing with teaching; (vii) the Court will accept the Plea Agreement, filed February 3, 2017 (Doc. 43)("Plea Agreement"), under rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure; (viii) the Court will assign Herlihy a sentence of 1 day or time served, whichever is less, followed by a term of supervised release for three years, during which Herlihy must not incur new credit charges (except that he may use current credit cards as needed), negotiate or consummate any financial contracts or open additional lines of credit without the United States Probation Officer's prior approval, must provide the United States Probation Office ("USPO") access to any requested financial information and authorize the release of any financial information, must complete 100 hours of community service during the first year of supervised release, must file timely, accurate and lawful income tax returns and provide proof of such filing to the USPO as requested, and must seek approval from the Court regarding employment that involves financial advising and, during the term of supervised release must keep the Court advised of any teaching.  The Court therefore sustains the Objections in part and

overrules them in part.

## **FACTUAL BACKGROUND**

The Court takes the facts from the Plea Agreement. Because neither party objects to the Plea Agreement's recitation of the facts, the Plea Agreement's facts will serve as the Court's findings of fact for purposes of this sentencing. See Objections at 3-21; United States' Sentencing Memorandum at 4-6, filed August 10, 2017 (Doc. 57)("U.S. Sentencing Memo."); Draft Transcript of Sentencing Hearing at 19:19-21:25 (taken August 11, 2017)("Tr.") (Coberly, Court, Sullivan, Tanny).[4] The Plea Agreement describes the offense conduct as follows:

> I was previously employed by a truck stop business in Deming New Mexico. This business consisted of several limited liability companies, including (1) Savoy Travel Center, LLC, (2) Truckers Paradise, LLC, and (3) Fuel 4 Less, LCC. While employed by the truck stop business, I participated in a loan transaction with 1st New Mexico Bank (hereinafter, "1st New Mexico"). The truck stop borrowed $60,125.00 in principal from 1st New Mexico on February 23, 2010. Full payment of the loan was required on or before March 9, 2010. The truck stop business repaid the principal and interest on this loan in a timely fashion.

> As an employee of the truck stop business, I agreed to and signed several documents to effectuate the loan. These documents included a "Commercial Security Agreement," which stated that the "Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this agreement." The commercial Security Agreement identified the collateral to include New Mexico liquor license 2788, the "Grantor" as Truckers Paradise, LLC, and the "Lender" as 1st New Mexico Bank.

> I entered into and signed the Commercial Security Agreement knowing that the liquor license referenced in the document was already encumbered. Indeed, I had previously participated in other financial transactions involving this liquor license. On or about December 6, 2008 I signed a promissory note as the "Operating Manager" of Truckers Paradise, LLC. I pledged the liquor license as collateral for a loan for $140,000.00 extended to Truckers Paradise, LLC, by

---

[4]The Court's citations to the Draft Transcript of Sentencing Hearing (taken August 11, 2017)("Tr."), refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

Maurice P. and Diana J. Bonal of Santa Fe, New Mexico. I promised and agreed to "keep" the liquor license "free and clear of any liens, law suits or any claims against the License and in good standing with the New Mexico Alcohol & Gaming Division." On or about November 23, 2009, I signed a second promissory note in the amount of $100,000.00. This promissory note superseded the first promissory note of December 6, 2018.

At the time of the above-described loan transaction with 1st New Mexico Bank, Truckers Paradise LLC, still owed payment to Mr. and Mrs. Bonal and the promissory note was still in effect. Truckers Paradise, LLC, did not own the liquor license free and clear of any liens or other encumbrances, and all of my statements and representations to the contrary in the Commercial Security Agreement were false statements. I made these false statements knowingly.

Furthermore, I observed my co-defendant, Bruce Beckner, participate in the loan transaction with 1st New Mexico Bank. Beckner identified himself as "Bill Evans" during the transaction. At that time, I knew Beckner as the de facto owner and operator of the truck stop business. I observed that the Commercial Security Agreement had the name "Bill Evans" and a signature for "Bill Evans" on the documents. However, I knew that Beckner's true name was not "Bill Evans" and that Beckner used the alias "Bill Evans" to conceal his true identity after a previous criminal conviction for a financial crime.

Plea Agreement ¶ 8, at 4-5.

## PROCEDURAL BACKGROUND

At the Plea Hearing, held before the Honorable Laura Fashing, United States Magistrate Judge for the United States District Court for the District of New Mexico, Herlihy pled guilty to the Information. See Information at 1, filed February 3, 2017 (Doc. 40). See also Clerk's Minutes at 1, filed February 3, 2017 (Doc. 44)("Plea Hearing Minutes"). The Information charges:

On or about February 23, 2010, in Luna County, in the District of New Mexico and elsewhere, the defendant, **ARTHUR HERLIHY**, did knowingly make a false statement on a loan document, to wit a Commercial Security Agreement, for the purpose of influencing the actions of 1st New Mexico Bank, an institution whose accounts are insured by the Federal Deposit Insurance Corporation.

Information at 1 (bold in original). The Indictment charges that this was "[i]n violation of 18 U.S.C. § 1014." Information at 3. On February 3, 2017, Plaintiff United States of America and

Herlihy entered into the Plea Agreement in which Herlihy pled guilty to making a false statement to a bank. See generally Plea Agreement. The Plea Agreement recommends that a specific sentence of imprisonment in the range of 0 to 18 months is the appropriate disposition in this case, and agreed that the Court may enter an order of restitution pursuant to the Mandatory Victim's Restitution Act, 18 U.S.C. § 2663A. See Plea Agreement ¶ 10(a), at 6; id. ¶ 15, at 8.

1.      **The PSR.**

The PSR summarizes the offense conduct:

35.     **Herlihy**, along with co-conspirators [Sean] Curtis and Beckner (a.k.a. Bill Evans), made fraudulent representations pertaining to a $16.5 million loan through New Mexico Finance Authority, involving the New Markets Tax Credit, a program supported by the United States Department of the Treasury. The funds were to be used to acquire, renovate and substantially improve a truck stop, including a construction of a restaurant, motel and RV park.

36.     In 2006, Finance New Mexico was created to help bolster the economy of the State of New Mexico. The limited liability company is owned by the New Mexico Finance Authority, a broad-based financing agency, and New Mexico Community Capital, a certified non-profit community development financial institution (CDFI). The New Mexico Finance Authority acts as Managing Member and provides staff support to the Community Development Entity. In 2007, Finance New Mexico was awarded an allocation of $110 million in New Markets Tax Credits authority, which enabled Finance New Mexico to generate capital that was lent directly to qualified businesses in low-income areas.

37.     Fuel 4 Less, LLC, was a limited liability company which was organized by Sandra Franklin in the State of New Mexico in September of 2005. In late 2007, Beckner, **Herlihy**, and Curtis purchased the Savoy Travel Center located near Deming, New Mexico. When purchased, the truck stop was dilapidated and these individuals began looking for funds to allegedly remodel the truck stop. **Herlihy** was subsequently hired as the operating manager.

38.     In early 2008, Beckner, **Herlihy**, and Curtis created over a dozen limited liability companies (LLC's) affiliated with Fuel 4 Less/Savoy Travel Center and opened several bank accounts at different financial institutions in the

names of the various LLCs. Furthermore, the owners of Fuel 4 Less were identified as Sean Curtis, **Arthur Herlihy** and Seashell Fuel Corporation based in Panama, Central America. Fuel 4 Less was the majority owner (99%) of Savoy Travel Center, LLC, a limited liability company organized by Sean Curtis in the State of New Mexico in November of 2007. **Arthur Herlihy** owned the remaining 1% of Savoy Travel Center. Combined, the two companies operated the Savoy Travel Center, a truck stop located west of Deming, New Mexico, from September of 2005 until September of 2011.

39.   In October 2009, Beckner, **Herlihy**, and Curtis applied for and received a loan for $16.5 million from the New Mexico Finance Authority (NMFA) for the purpose of developing Savoy Travel Center (DBA Fuel 4 Less). In addition, Beckner, **Herlihy**, and Curtis solicited approximately $5.5 million in investments for Savoy Travel Center/Fuel 4 Less from private investors. The investigation revealed the subjects used Rita Xiomara Romero-Jimenez, a Honduran National married to Beckner, to assist them with moving the proceeds of their crimes out of the United States to accounts in Honduras and Panama.

40.   The loan proceeds of $16,308,600 -- obtained through the New Markets Tax Credit program promoted by the United States Department of the Treasury -- were wire transferred to a business bank account at US Bank (account number 3946) in the name of Fuel 4 Less.

. . . .

42.   In addition, **Herlihy** and his co-conspirators solicited investments from victims and issued promissory notes with interest rates of 24% to 36% per annum, payable in monthly installments. Interviews with victims revealed discrepancies regarding the purpose and use of investment funds. Untrue or misleading statements and/or omissions of material facts have deceived investors to be able to fully evaluate the suitability of their investments. Interest payments stopped as early as 2009 for some investors and no payments have been made to any investor since 2011. Approximately $5.5 million have been obtained from dozens of investors.

. . . .

51.   On September 30, 2014, agents spoke with Abraham Camarena by telephone. Camarena was the senior vice president in charge of commercial loans with 1st New Mexico Bank in Deming, New Mexico. Camarena oversaw the loan process when Beckner, Curtis, and **Herlihy** applied for and obtained a loan for $135,165 in July of 2009. During the process, Beckner, **Herlihy**, and Curtis pledged a liquor license as collateral to obtain

the loan but failed to disclose the license had already been pledged to another entity. Beckner also failed to disclose he was using an alias (Bill Evans) to apply for the loan.

52. On January 15, 2015, agents spoke with Maurice Bonal in Santa Fe, New Mexico. Bonal brokers the sale of liquor licenses and was involved with the sale of a liquor license to Fuel 4 Less in April 2008 for $300,000. At the time, Fuel 4 Less was represented by **Art Herlihy** and was purchasing the liquor license for the truck stop via the entity Trucker's Paradise.

53. Bonal facilitated the sale of New Mexico Liquor License No. 2788 as well as the transfer of the license from Santa Fe County (where the license had been located) to Luna County (home of the truck stop) in New Mexico. Bonal also loaned **Herlihy** and Fuel 4 Less (DBA Trucker's Paradise) approximately $100,000 in order to complete the sale since **Herlihy**/Fuel 4 Less did not have all of the funds to make the purchase.

54. As a result, **Herlihy** signed a Promissory Note, a Bill of Sale, and a Form UCC-1 Financing Statement which was filed with the Secretary of State. Bonal received some payments on his initial loan to **Herlihy**/Fuel 4 Less but those payments ceased in early 2011.

55. According to the Promissory Note and to Bonal, Bonal was the only secured interest of the liquor license and no permission was ever given for **Herlihy** or any others to pledge the liquor license as collateral for any other loan.

56. In summary, **Herlihy** and his co-conspirator were involved in a Ponzi-type scheme to defraud dozens of inventors, involving approximately $5.5 million in promissory notes, investments in Fuel 4 Less LLC, a truck stop and gas station in Southern New Mexico. **Herlihy** and his co-conspirator advertised business opportunities in the Los Angeles Times. **Herlihy** and his co-conspirator were not registered agents or broker dealers permitted by law to offer or sell securities. **Herlihy** and his co-conspirator withheld material facts from the purchasers of these securities, notably that Beckner (a.k.a. Bill Evans) was a felon convicted previously of securities fraud, and that the UCC Liens provided to the investors to protect their investments were replicated again and again rendering them meaningless, and subordinated to the New Mexico Finance Authority. Initially interest payments were made on the promissory notes. However, the business was failing and interest payments eventually ceased sometime during 2010 and 2011. The underlying investments were not returned, defrauding investors. Additionally, **Herlihy** and his co-conspirator made fraudulent representations or omissions pertaining to a $16.5 million loan through New Mexico Finance Authority and other financial institutions. Lastly, **Herlihy**

was directly attributable to a loan transaction with 1st New Mexico Bank, which the truck stop borrowed $60,125.00 in principal from 1st New Mexico on February 23, 2010. The truck stop business repaid the principal and interest on this loan in a timely fashion.

57.     **Herlihy** was the operating manager of Savoy Travel Center and as such performed all management duties and business operations. **Herlihy** opened all bank accounts for Savoy Travel Center, as well as various bank accounts for multiple Limited Liability Companies (LLCs) affiliated with Savoy Travel Center. These LLCs were established by **Herlihy** and his co-conspirators. Additionally, **Herlihy** signed all promissory notes and subscription agreements. However, there was no evidence the defendant exercised control over others in the Ponzi scheme, therefore, the defendant was not be assessed an aggravating or mitigation role adjustment.

PSR ¶¶ 35-40, 42, 51-57, at 8-13 (bold in original).

In the PSR, the USPO calculates Herlihy's base offense level at 7 pursuant to U.S.S.G. § 2B1.1(a)(1). See PSR ¶ 64, at 14. The USPO increased the base offense level 20 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(K) on the theory that, in the pleaded offense, "the defendant and co-conspirator made fraudulent representations pertaining to a $16.5 million loan through New Mexico Finance Authority," and "the defendant and co-conspirator were involved in a Ponzi-type scheme to defraud dozens of investors, involving approximately $5.5 million in promissory notes." PSR ¶ 65, at 14. The USPO added a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A), on the theory that, in the pleaded offense, the truck stop "paid for the financing of advertisements to be placed into the Los Angeles (LA) Times" that resulted in the defrauding of dozens of investors. PSR ¶ 66, at 14. The USPO added another 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because Herlihy used sophisticated means to "solicit[] approximately $5.5 million in investments" for the truck stop from individual investors and then move the proceeds out of bank accounts in the United States and into Honduras and Panama. PSR ¶ 67, at 14-15. The USPO added another 2-level enhancement under U.S.S.G. § 3B1.3, because Herlihy

abused his private trust as a manager of the truck stop, and used special skills gained from his work and education history to "assist in the scheme and artifice." PSR ¶ 69, at 15. The USPO decreased the total offense level by 2 pursuant to U.S.S.G. § 3E1.1(a), because Herlihy accepted responsibility for the offense. See PSR ¶ 73, at 15. The USPO decreased the total offense level by an additional point pursuant to U.S.S.G. § 3E1.1(b), because Herlihy "assisted authorities in the investigation or prosecution of [his] own misconduct by timely notifying authorities of [his] intent to enter a plea of guilty." PSR ¶ 74, at 15. After applying all of the foregoing adjustments, the USPO calculated Herlihy's total offense level as 30. See PSR ¶ 75, at 15. With a criminal history score of 0 and corresponding criminal history category of I, see PSR ¶ 79, at 16, this total offense level resulted in: (i) a guideline imprisonment range of 97 months to 121 months, see PSR ¶ 106, at 24; (ii) a guideline supervised release range of 2 years to 5 years, see PSR ¶ 111, at 24; and (iii) a guideline fine range of $15,000.00 to $1,000,000.00, see PSR ¶ 117, at 25. The USPO also determined that the Court should order restitution under U.S.S.G. § 5E1.1. See PSR ¶ 120, at 25.

       **2.**      **The Objections.**

Herlihy filed his Objections on July 6, 2017, requesting an evidentiary hearing. See Objections at 1. According to Herlihy, the PSR "erroneously characterizes [him] as one of the masterminds behind a series of fraudulent schemes" and fails to recognize that he was Beckner's "fall guy" for frauds unbeknownst to him. Objections at 1. Herlihy contends that he pleaded guilty only to making a false statement to a bank, for a $60,125.00 loan and which was repaid on time and in full. See Objections at 2. This statement notwithstanding, Herlihy says, the USPO attributes "essentially all of the allegations in the original indictment to [him] as relevant conduct" when it

calculated his Guidelines sentencing range, recommends a fine, and recommends special conditions.  Objections at 2.

According to Herlihy, he was neither involved in nor aware of most of Beckner's fraudulent conduct.  See Objections at 2.  Furthermore, Herlihy insists, the USPO erroneously attributes to Herlihy some of Beckner's conduct as well as some of Herlihy's conduct that was not in furtherance of any fraud or scheme.  See Objections at 3.  Herlihy then presents what he refers to as a "factual objection[]," taking issue with the PSR's inclusion of conduct that falls outside U.S.S.G § 1B1.3(a)(1) and (2)'s definition of relevant conduct.  Objections at 3 (citing U.S.S.G. § 1B1.3(a)(1) and (2)).  Herlihy then makes thirty-nine specific objections to the PSR that he characterizes as factual objections.  See Objections at 5-21.  Herlihy additionally objects to the imposition of a fine, as well as two of the special conditions of supervision.  See Objections at 21-24.  The Court will evaluate each objection.

**3.  The First Addendum To The PSR.**

On July 14, 2017, the USPO filed its first addendum to the PSR, in which it responded to Herlihy's Objections.  See Addendum to the Presentence Report at 1, filed July 14, 2017 (Doc. 54)("First Addendum").  The UPSO rejected each of Herlihy's Objections and determined that the portions of the PSR to which Herlihy objects will remain unchanged.  See First Addendum at 1-17.  The UPSO makes a correction to the name of a bank referenced in the PSR and updated the sections in the PSR on Herlihy's relationship status and employment record based on new information.  See First Addendum at 17.

**4.  Herlihy's Sentencing Memorandum.**

On August 2, 2017, Herlihy filed his sentencing memorandum.  See Defendant's

Sentencing Memorandum, filed August 2, 2017 (Doc. 56)("Herlihy Sentencing Memo."). Herlihy asked the Court to: (1) accept the rule 11(c)(1)(C) plea agreement; and (2) sentence him to time served followed by two years of supervised release. See Herlihy Sentencing Memo. at 1. Herlihy maintains, in accordance with the Objections that he filed, that Beckner's schemes are not relevant conduct for Herlihy's offense level calculation. See Herlihy Sentencing Memo. at 6. Herlihy therefore maintains that his offense level should be calculated as 5, which results in a sentencing range of 0 to 6 months of imprisonment. See Herlihy Sentencing Memo. at 6.

Herlihy requests that the Court accept the rule 11(c)(1)(C) plea agreement and sentence him to what he maintains is a within-guidelines sentence of one day of imprisonment -- time served. See Herlihy Sentencing Memo. at 6. Herlihy notes that his offense of conviction under 18 U.S.C. § 1014 is a Class B felony and that, under U.S.S.G. § 5D1.2(a)(1), the Guidelines range for supervised release is 2 to 5 years. See Herlihy Sentencing Memo. at 6. Herlihy requests that the Court sentence him to time served with a supervised release term of 2 years. See Herlihy Sentencing Memo. at 11.

**5.      The United States' Sentencing Memorandum.**

On August 10, 2017, the United States filed its sentencing memorandum. See U.S. Sentencing Memo. at 1. The United States asks the Court to sentence Herlihy to time served followed by five years of supervised release, a fine of $5,000.00, and a special penalty assessment of $100.00. See U.S. Sentencing Memo. at 1. The United States notes that the Indictment's Count 1 charged Herlihy with bank fraud for obtaining a loan of $135,165.00 from 1st New Mexico Bank in July, 2009, for the stated purpose of paying off an outstanding debt on a liquor license. See U.S. Sentencing Memo. at 2. The United States explains that it received documents after the grand

jury returned the Indictment that undercut its ability to prove Herlihy's guilt on the Indictment's other four counts, along with evidence that the truck stop's office employees regularly used a signature stamp bearing Herlihy's name on documents without his knowledge, calling into question Herlihy's role in issuing the promissory note that placed an encumbrance on the truck stop's liquor license before Herlihy took out the loan with 1st New Mexico Bank.  <u>See</u> U.S. Sentencing Memo. at 2-3.  The United States asserts that, based on these changed circumstances, it agreed to let Herlihy enter into a plea agreement charging him only with making a false statement on the second 1st New Mexico Bank loan application.  <u>See</u> U.S. Sentencing Memo. at 3-4.

The United States maintains -- contrary to the USPO's position -- that the far-reaching conspiracy in this case was almost exclusively the result of Beckner's actions, not Herlihy's actions, and that Herlihy is responsible under U.S.S.G. § 1B1.3 only for conduct that "is within the scope of jointly undertaken criminal activity, in furtherance of criminal activity, and reasonably foreseeable in connection with that criminal activity."  U.S. Sentencing Memo. at 4 (citing U.S.S.G. § 1B1.3(a)).  The United States interprets this requirement to mean that the Court should hold Herlihy accountable only for the offense charged in the Information.  <u>See</u> U.S. Sentencing Memo. at 4.  The United States therefore again urges the Court to accept the rule 11(c)(1)(C) plea agreement, and sentence Herlihy to time served followed by five years of supervised release, a $5,000.00 fine, and a $100.00 special penalty assessment.  <u>See</u> U.S. Sentencing Memo. at 6.

6.     <u>The Second Addendum to the PSR.</u>

On August 10, 2017, the USPO filed its Second Addendum to the Presentence Report, filed August 10, 2017 (Doc. 59)("Second Addendum"), in which it: (i) acknowledges the United States' Sentencing Memorandum; (ii) acknowledges Herlihy's Objections; (iii) amends the PSR to

remove the imposition of a fine; and (iv) amends the PSR to include a condition of 100 hours of community service during Herlihy's first year of supervised release. <u>See</u> Second Addendum at 1. The USPO does not change its calculation of Herlihy's offense level or Guideline range. <u>See</u> Second Addendum.

**<u>RELEVANT LAW REGARDING THE GUIDELINES</u>**

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551-59, thus making Guidelines sentencing ranges effectively advisory. In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." <u>United States v. Booker</u>, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

      (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B)     to afford adequate deterrence to criminal conduct;

      (C)     to protect the public from further crimes of the defendant; and

      (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

[A] defendant who has been found guilty of an offense described in any Federal

statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008). This presumption, however, is an appellate presumption and not one that the trial court can or should apply. See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351. Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[5] Guidelines sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first

---

[5]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory. Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-

task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's <u>Booker</u> arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure

---

contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

        The Supreme Court held in <u>United States v. Booker</u> that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in <u>Kimbrough v. United States</u> that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their <u>United States v. Booker</u>-granted authority to post-Guidelines analysis "variances." <u>Irizarry v. United States</u>, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. <u>See Gall v. United States</u>, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, <u>such as failing to calculate (or improperly calculating) the Guidelines range</u>, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

<u>United States v. Nolf</u>, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

actors in the <u>Booker</u> calculus, even if the court does not grant a downward departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case." <u>Kimbrough v. United States</u>, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has concluded that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. <u>See</u> <u>United States v. Almendares-Soto</u>, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in <u>United States v. Jager</u>, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## ANALYSIS

The Court sustains Herlihy's Objections in part and overrules them in part. The Court sustains Herlihy's Objection to the $16.5 million NMFA loan and the $5.5 million Ponzi scheme to defraud individual investors being considered conduct relevant to the convicted offense of making a false statement as part of the second loan application to 1st New Mexico Bank, because they fail to satisfy U.S.S.G. § 1B1.3's requirements for relevant conduct. The Court sustains Herlihy's Objections to the narrative portions of the PSR that deal exclusively with this unrelated

conduct.  Because the Court concludes that the $16.5 million NMFA loan and the $5.5 million

Ponzi scheme to defraud individual investors are not relevant conduct under U.S.S.G. § 1B1.3(B),

the Court sustains Herlihy's Objections to the offense level calculation, concluding that the total

offense level should be 5.  Because the Court concludes that the total offense level should be 5,

the Court sustains Herlihy's Objection to the Guidelines imprisonment range and concludes that

the Guidelines imprisonment range should be 0 months to 6 months.  The Court sustains Herlihy's

Objection to the portions of the PSR section on Factors That May Warrant a Sentence Outside of

the Advisory Guideline System that deal with unrelated conduct or are not consistent with the

correctly calculated total offense level.  The Court sustains Herlihy's Objection to the imposition

of a fine.  The Court sustains Herlihy's Objection to the terms of the special condition of

supervision dealing with credit charges.   The Court sustains Herlihy's Objection to the terms of

the special condition of supervision dealing with teaching.  The Court overrules Herlihy's

Objection to the characterization of the loan from M. Bonal in PSR ¶¶ 53-54, at 12.

I.    **THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE SUGGESTION THAT HE WAS PART OF SCHEMES TO DEFRAUD OR THAT THOSE SCHEMES WERE IN FURTHERANCE OF HIS JOINTLY UNDERTAKEN CRIMINAL ACTIVITY.**

The PSR's ¶ 11, at 4, reads as follows:

> The investigation of Fuel 4 Less/Savoy Travel Center had involved two separate schemes to defraud.  The first scheme involves material omissions and false statements used to obtain loan funding from a number of sources.  The second scheme involved material omissions and false statements used to solicit individual investors for funding.

PSR ¶ 11, at 4.  In Objection 1, Herlihy "objects on factual grounds" to the suggestion that he was

part of schemes to defraud or that these schemes were in furtherance of his jointly undertaken

criminal activity.  Objections at 5-6.  As Herlihy sees it, his false statement to 1st New Mexico

Bank is an isolated bank transaction that was not part of any broader scheme to defraud. See Objections at 6. Moreover, Herlihy argues that (i) he did not make any knowingly false representations related to transactions with any other banks; (ii) each bank transaction was distinct and the transactions cannot be grouped into a single scheme to defraud; (iii) he never jointly agreed to participate in any scheme to defraud; and (iv) Beckner misled him as well and set him up as the "fall guy" for the larger schemes. Objections at 6-7.

The Court concludes that the United States and Herlihy correctly contend that the schemes to use material omissions and false statements to obtain loan funding and solicit individual investors for funding are not relevant conduct. Under U.S.S.G. § 1B1.3(a)(1), relevant conduct in a jointly undertaken criminal activity is "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). In the Guidelines application notes, the United States Sentencing Commission emphasizes that these requirements are conjunctive and that "the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy." U.S.S.G. § 1B1.3 note 2. The United States Sentencing Commission clarifies that a sentencing court must "first determine the scope of the criminal activity the particular defendant agreed to jointly undertake," adding that "the conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision." U.S.S.G. § 1B1.3 note 2. The application then presents a hypothetical scenario of a defendant who participates in only one occasion of her boyfriend's ongoing drug activity to explain that a defendant is accountable only for a specific instance of jointly undertaken criminal activity, i.e., that categorically similar

ongoing activity cannot be pinned to a defendant.  See U.S.S.G. § 1B1.3 note 2(C)(5).

Herlihy pled guilty to one count of making a false statement to 1st New Mexico Bank during the loan application process.  Making a false statement during a single loan application process is separately identifiable and distinct from the other fraudulent schemes that were part of the truck stop business.  As the United States Court of Appeals for the Eleventh Circuit explained in United States v. Blanc, 146 F.3d 847 (11th Cir. 1998), U.S.S.G. § 1B1.3(a)(2)'s purpose is "to take account of a 'pattern of misconduct that cannot readily be broken into discrete identifiable units that are meaningful for purposes of sentencing,'" and where "the conduct is subject to meaningful subdivision into wholly discrete and identifiable units," it is not relevant for Guidelines purposes.  146 F.3d at 852-53 (quoting United States v. Maxwell, 34 F.3d 1006, 1010 (11th Cir. 1994)).  The United States Court of Appeals for the Fourth Circuit takes a similar stance, holding in United States v. Mullins, 971 F.2d 1138 (4th Cir. 1992), that such a narrow understanding of relevant conduct is necessary lest the term "relevant conduct" expand to encompass any uncharged criminal activity.  See 971 F.2d at 1145.  The Court concludes that the convicted offense -- making a false statement to a bank -- is distinct from the truck stop's successful efforts to obtain a $16.5 million loan from a different bank the year before the convicted offense.  It therefore fails to satisfy U.S.S.G. § 1B1.3's definitional requirements for relevant conduct, and the USPO therefore incorrectly applied the 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K).  If 1st New Mexico Bank had suffered a complete loss of the $60,125.00 loan to Herlihy, U.S.S.G. § 2B1.1(b)(1)(D) would require the USPO to add 6 levels to Herlihy's base offense level.  See U.S.S.G. § 2B1.1(b)(1)(D).  The USPO notes in the PSR, however, that the $60,125.00 amount was timely paid in full, resulting in no loss from that discrete fraudulent conduct.  See PSR ¶ 56,

at 13.  The Court therefore sustains Herlihy's Objection 1, concluding that the USPO erred when it concluded that the $16.5 million NMFA loan and the $5.5 million Ponzi scheme to defraud individual investors is conduct relevant to the convicted offense of making a false statement as part of the second loan application to 1st New Mexico Bank.  See PSR ¶ 65, at 14.

## II.  THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE NARRATIVE SECTIONS OF THE PSR BASED ON OTHER SCHEMES TO DEFRAUD.

Herlihy objects in Objections 2 through 27 to portions of the PSR which elaborate on the schemes to obtain loan funding and solicit individual investors.  See Objections at 8-16.  In particular, Herlihy objects that portions of PSR ¶¶ 12-35, 37-45, and 47-49, at 4-12,  detail conduct that is not relevant to Herlihy's convicted offense or contain factual inaccuracies.  See Objections at 8-16.  Herlihy further contends that, under rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure, an evidentiary hearing is necessary for all issues that the Court considers relevant for sentencing and for which Herlihy has disputed the factual basis.  See Objections at 17-18.  The Court determines supra, part I, that only the second loan application with 1st New Mexico Bank falls within the locus of relevant conduct for the convicted offense in this case.  Because PSR ¶¶ 11-50 address conduct separate from the second loan application with 1st New Mexico Bank, they are not relevant conduct under U.S.S.G. § 1B1.3.  See PSR ¶¶ 11-50, at 4-12.  Because PSR ¶ 11-50 do not describe relevant conduct, the Court need not determine whether they contain factual inaccuracies.  The Court therefore sustains Herlihy's Objections 2-27, and concludes that the USPO should remove PSR ¶¶ 11-50, at 4-12.  See Tr. at 19:22-24 (Coberly); id. at 21:19-25 (Court, Sullivan, Tanny).

## III.  THE COURT SUSTAINS HERLIHY'S OBJECTION TO PSR ¶ 51, AT 12.

PSR ¶ 51, at 12, reads:

> On September 30, 2014, agents spoke with Abraham Camarena by
> telephone. Camarena was the senior vice president in charge of commercial loans
> with 1st New Mexico Bank in Deming, New Mexico. Camarena oversaw the loan
> process when Beckner, Curtis, and **Herlihy** applied for and obtained a loan for
> $135,165 in July of 2009. During the process, Beckner, **Herlihy**, and Curtis
> pledged a liquor license as collateral to obtain the loan but failed to disclose the
> license had already been pledged to another entity. Beckner also failed to disclose
> he was using an alias (Bill Evans) to apply for the loan.

PSR ¶ 51, at 12 (bold in original). In Objection 28, Herlihy objects that: (i) PSR ¶ 51, at 12,

describes a loan transaction that occurred in July, 2009, to obtain bridge financing until the NMFA

loan closed; and (ii) it is unrelated to the convicted offense. See Objections at 16. At the

sentencing hearing, Herlihy and the United States jointly agreed to end PSR ¶ 51, at 51, with

"Beckner, Herlihy, and Curtis pledged a liquor license as collateral to obtain the loan," and remove

the language that follows. Tr. at 20:5-6 (Coberly). See Clerk's Minutes at 3, filed August 11,

2017 (Doc. 63)("Sentencing Hearing Minutes"); Tr. at 20:3-10 (Coberly); id. at 21:19-25 (Court,

Sullivan, Tanny).

The first loan from 1st New Mexico Bank is not relevant conduct for the second loan from

1st New Mexico Bank, because they were separate in time and purpose, and the first loan was not

entered in furtherance of the second loan's application. The first loan application was filed in July,

2009, and was intended to secure bridge financing to cover construction costs while waiting for

the NMFA loan's approval. See PSR ¶ 12, at 4. Herlihy was not aware during this loan application

process that the truck stop's liquor license loan had not yet been paid. See Objections at 16. The

second loan application was filed in February, 2010, and was intended to cover a down payment

on a house. See Objections at 5. See also PSR ¶ 56, at 13. During the second loan application,

Herlihy was aware that the truck stop's liquor license had not yet been paid off and therefore

committed the convicted offense when he represented that the license was not encumbered on the

loan application. <u>See</u> Plea Agreement at 4. The two loans were obtained for different purposes, and the receipt of the first loan did not facilitate the second loan application. The Court therefore concludes that removing the language in the PSR ¶ 51, at 12, after "Beckner, Herlihy, and Curtis pledged a liquor license as collateral to obtain the loan" is appropriate.[6] The Court thus sustains Herlihy's Objection 28.

## IV. THE COURT OVERRULES HERLIHY'S OBJECTION TO THE DESCRIPTION OF THE LOAN FROM MAURICE BONAL.

In Objection 29, Herlihy objects to PSR ¶¶ 53-54, at 16, stating that they suggest that Bonal made a loan to Herlihy rather than to Trucker's Paradise LLC. <u>See</u> Objections at 16. At the hearing on the Objections, Herlihy and the United States jointly agreed that this language did not need to be removed. <u>See</u> Sentencing Hearing Minutes at 3; Tr. at 20:20-21 (Coberly); <u>id.</u> at 21:19-25 (Court, Sullivan, Tanny). The Court concludes that Herlihy's reading of PSR ¶¶ 53-54, at 16, is unnatural and that the text does not suggest that the loan was for Herlihy personally. Additionally, whether Herlihy or Fuel 4 Less possessed the liquor license is not considered in calculating Herlihy's offense level or criminal history score. The Court therefore overrules Herlihy's Objection 29.

## V. THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE NARRATIVE SUMMARY'S PORTIONS THAT DEAL WITH SCHEMES SEPARATE FROM HIS CONVICTED OFFENSE.

PSR ¶ 56, at 13, reads:

> In summary, **Herlihy** and his co-conspirator were involved in a Ponzi-type scheme to defraud dozens of inventors, involving approximately $5.5 million in promissory notes, investments in Fuel 4 Less LLC, a truck stop and gas station in

_____

[6]The language to be removed is "but failed to disclose the license had already been pledged to another entity. Beckner also failed to disclose he was using an alias (Bill Evans) to apply for the loan." PSR ¶ 51, at 12. <u>See</u> Tr. at 20:3-10 (Coberly); <u>id.</u> at 21:19-25 (Court, Sullivan, Tanny).

Southern New Mexico. **Herlihy** and his co-conspirator advertised business opportunities in the Los Angeles Times. **Herlihy** and his co-conspirator were not registered agents or broker dealers permitted by law to offer or sell securities. **Herlihy** and his co-conspirator withheld material facts from the purchasers of these securities, notably that Beckner (a.k.a. Bill Evans) was a felon convicted previously of securities fraud, and that the UCC Liens provided to the investors to protect their investments were replicated again and again rendering them meaningless, and subordinated to the New Mexico Finance Authority. Initially interest payments were made on the promissory notes. However, the business was failing and interest payments eventually ceased sometime during 2010 and 2011. The underlying investments were not returned, defrauding investors. Additionally, **Herlihy** and his co-conspirator made fraudulent representations or omissions pertaining to a $16.5 million loan through New Mexico Finance Authority and other financial institutions. Lastly, **Herlihy** was directly attributable to a loan transaction with 1st New Mexico Bank, which the truck stop borrowed $60,125.00 in principal from 1st New Mexico on February 23, 2010. The truck stop business repaid the principal and interest on this loan in a timely fashion.

PSR ¶ 56, at 13 (bold in original). In Objection 30, Herlihy argues that, aside from the convicted offense, he is not a culpable participant in any of the activities that PSR ¶ 56, at 13, lists. See Objections at 16-17. The Court determines supra, part I, that only the second loan application with 1st New Mexico Bank falls within the locus of relevant conduct for the convicted offense in this case. The majority of PSR ¶ 56, at 13, deals with conduct that is not relevant to the convicted offense; however, the final two sentences directly relate to the relevant conduct. The Court therefore sustains Herlihy's Objection 30 insofar as it addresses the allegations in PSR ¶ 56, at 13. See Tr. at 20:21-22 (Coberly); id. at 21:19-25 (Court, Sullivan, Tanny).

## VI.    THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE PSR'S CHARACTERIZATION OF HIS MANAGERIAL ROLE AT THE TRUCK STOP.

PSR ¶ 57, at 13, reads:

**Herlihy** was the operating manager of Savoy Travel Center and as such performed all management duties and business operations. **Herlihy** opened all bank accounts for Savoy Travel Center, as well as various bank accounts for multiple Limited Liability Companies (LLCs) affiliated with Savoy Travel Center. These LLCs were established by **Herlihy** and his co-conspirators. Additionally,

**Herlihy** signed all promissory notes and subscription agreements. However, there was no evidence the defendant exercised control over others in the Ponzi scheme, therefore, the defendant was not be assessed an aggravating or mitigation role adjustment.

PSR ¶ 57, at 13 (bold in original). In Objection 31, Herlihy argues that PSR ¶ 57, at 13, misstates

his role at the truck stop. See Objections at 17. According to Herlihy, he held the title of operating

manager, but performed only on-site managerial duties for a short period in early 2008. See

Objections at 17. Herlihy disputes the assertion in PSR ¶ 57, at 13, that he performed all

management duties and business operations in that role as titular operating manager. See

Objections at 17.

At the sentencing hearing, Herlihy and the United States jointly agreed that this summary

could be replaced with the statement of facts from the Plea Agreement, starting at the top of Page 4,

going through the last full paragraph of Page 5, taking that exact language, except changing the

word "I" to "Herlihy." Sentencing Hearing Minutes at 3. See Tr. at 20:22-21:15 (Coberly); id.

at 21:19-25 (Court, Sullivan, Tanny). The Court holds that this compromise is an acceptable

replacement for PSR ¶ 57, at 13, to provide a narrative summary of the facts.[7] See Tr. at 21:25

_____

[7]The USPO should remove PSR ¶ 57, at 13, and add the following language from the Plea Agreement:

       Herlihy was previously employed by a truck stop business in Deming Mew Mexico. This business consisted of several limited liability companies, including (1) Savoy Travel Center, LLC, (2) Truckers Paradise, LLC, and (3) Fuel 4 Less, LCC. While employed by the truck stop business, Herlihy participated in a loan transaction with 1st New Mexico Bank (hereinafter, "1st New Mexico"). The truck stop borrowed $60,125.00 in principal from 1st New Mexico on February 23, 2010. Full payment of the loan was required on or before March 9, 2010. The truck stop business repaid the principal and interest on this loan in a timely fashion.

       As an employee of the truck stop business, Herlihy agreed to and signed several documents to effectuate the loan. These documents included a "Commercial

(Court).  The Court therefore sustains Herlihy's Objection 31.

---

Security Agreement," which stated that the "Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this agreement."  The commercial Security Agreement identified the collateral to include New Mexico liquor license 2788, the "Grantor" as Truckers Paradise, LLC, and the "Lender" as 1st New Mexico Bank.

Herlihy entered into and signed the Commercial Security Agreement knowing that the liquor license referenced in the document was already encumbered.  Indeed, Herlihy had previously participated in other financial transactions involving this liquor license.  On or about December 6, 2008 Herlihy signed a promissory note as the "Operating Manager" of Truckers Paradise, LLC. Herlihy pledged the liquor license as collateral for a loan for $140,000.00 extended to Truckers Paradise, LLC, by Maurice P. and Diana J. Bonal of Santa Fe, New Mexico.  Herlihy promised and agreed to "keep" the liquor license "free and clear of any liens, law suits or any claims against the License and in good standing with the New Mexico Alcohol & Gaming Division."  On or about November 23, 2009, Herlihy signed a second promissory note in the amount of $100,000.00.  This promissory note superseded the first promissory note of December 6, 2018.

At the time of the above-described loan transaction with 1st New Mexico Bank, Truckers Paradise LLC, still owed payment to Mr. and Mrs. Bonal and the promissory note was still in effect.  Truckers Paradise, LLC, did not own the liquor license free and clear of any liens or other encumbrances, and all of Herlihy's statements and representations to the contrary in the Commercial Security Agreement were false statements.  Herlihy made these false statements knowingly.

Furthermore, Herlihy observed his co-defendant, Bruce Beckner, participate in the loan transaction with 1st New Mexico Bank.  Beckner identified himself as "Bill Evans" during the transaction.  At that time, Herlihy knew Beckner as the de facto owner and operator of the truck stop business. Herlihy observed that the Commercial Security Agreement had the name "Bill Evans" and a signature for "Bill Evans" on the documents.  However, Herlihy knew that Beckner's true name was not "Bill Evans" and that Beckner used the alias "Bill Evans" to conceal his true identity after a previous criminal conviction for a financial crime.

Plea Agreement at 4-5.

**VII.  THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE OFFENSE LEVEL ENCHANCEMENT UNDER U.S.S.G. § 2B1.1(b)(1)(K), IN PSR ¶ 65, AT 14.**

Herlihy objects to the USPO's calculation of the Sentencing Guidelines range for his convicted offense.  See Objections at 19.  Herlihy contends that the USPO misapplied a 20-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(K), see PSR ¶ 65, at 14, when it calculated a loss from Herlihy's fraud of more than $9.5 million.  See Objections at 19 (disputing the application).  According to Herlihy, there was no actual loss from the convicted offense, so the USPO should not have applied any upward adjustment.  See Objections at 19.  The Court determines supra, part I, that only the second loan application with 1st New Mexico Bank falls within the locus of relevant conduct for the convicted offense in this case.  As the USPO notes in the PSR, 1st New Mexico Bank did not sustain any financial loss from the fraudulent statement that Herlihy made to it, because the loan was timely paid in full.  See PSR ¶ 56, at 13.  U.S.S.G. § 2B1.1(b)(1)(K) states that, "[i]f the loss exceeded . . . [m]ore than $7,000,000," add 20 offense levels.  U.S.S.G. § 2B1.1(b)(1)(K).  Because the loan was timely paid in full, there was no financial loss, and U.S.S.G. § 2B1.1(b)(1)(K) is inapplicable.  See Tr. at 22:7-10 (Coberly); id. at 23:21-24:2 (Court, Sullivan, Tanny).  The Court concludes that the absence of loss means that the USPO erred when it applied the 20-level upward adjustment to Herlihy's offense level.  The Court therefore sustains Herlihy's Objection 32.

**VIII.  THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE OFFENSE LEVEL ENCHANCEMENT UNDER U.S.S.G. § 2B1.1(b)(2)(A), IN PSR ¶ 66, AT 14.**

Herlihy further objects to the USPO's application of a 2-level upward adjustment pursuant to U.S.S.G. § 2B1.1(b)(2)(A), see PSR ¶ 66, at 14, on the grounds that the convicted offense (i) did not involve ten or more victims; (ii) was not committed through mass marketing; and (iii) did not

result in substantial financial hardship to one or more victims.  See Objections at 19.  Because the condition of "substantial hardship to one or more victims" does not appear in the 2009 Guidelines, the Court concludes that the enhancement is not appropriate on this ground and considers only the other two possible grounds for the enhancement.[8]  See U.S.S.G. § 2B1.1(b)(2)(A).  The Court determines supra, part I, that only the second loan application with 1st New Mexico Bank falls within the locus of relevant conduct for the convicted offense in this case.

The Application Note to U.S.S.G. § 2B1.1 defines a victim as: "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense.  'Person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." U.S.S.G. § 2B1.1 note 1 (quoting U.S.S.G. § 2B1.1(b)(2)(A)).  The convicted offense involved at most one victim, 1st New Mexico Bank, and possibly involved no victims, as 1st New Mexico Bank did not sustain any financial loss from the fraudulent statement that Herlihy made to it, and the loan was timely paid in full.  See PSR ¶ 56, at 13.  In any case, the convicted offense does not involve ten or more victims.

The Application Note to U.S.S.G. § 2B1.1 defines mass-marketing as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit."  U.S.S.G. § 2B1.1 note 4(A).  The convicted offense of making a false statement to a bank was achieved by Herlihy signing a

---

[8]The Court may, however, consider that the Sentencing Commission has made this enhancement more difficult to apply when it considers Herlihy's request for time served.  See supra n.1 and accompanying text.

Commercial Security Agreement when he knew the liquor license referenced in the document was already encumbered.  See Plea Agreement at 4.  This crime does not involve solicitation to induce a large number of persons to do anything, because it involves only 1st New Mexico Bank.  Herlihy, therefore, did not commit the convicted offense through mass-marketing.  The USPO misapplied the adjustment for the same reason that it misapplied the 20-level upward adjustment which Objection 32 disputes, i.e., an erroneously broad interpretation of relevant conduct.  The Court therefore sustains Herlihy's Objection 33.  See Tr. at 22:10 (Coberly); id. at 23:21-24:2 (Court, Sullivan, Tanny).

IX.     **THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE OFFENSE LEVEL ENHANCEMENT UNDER U.S.S.G. § 2B1.1(b)(10)(C), IN PSR ¶ 67, AT 14-15.**

The USPO applies another 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C) on the theory that Herlihy: (i) relocated or participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; and (ii) used sophisticated means to commit his fraudulent conduct.   See PSR ¶ 67, at 14-15.   The USPO should apply this enhancement, if at all, pursuant to U.S.S.G § 2B1.1(b)(9), as that is where the condition appears in the 2009 Guidelines.  See U.S.S.G § 2B1.1(b)(9).  Herlihy objects that this enhancement is inapplicable, because the convicted offense -- making a false statement to a bank -- does not include him relocating the fraud scheme to a different jurisdiction or involve sophisticated means. See Objections at 19.  The convicted offense, which does not include the wire transfers charged in the Indictment, did not relocate the fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials but instead took place in the District of New Mexico.  See Plea Agreement at 5.  The Application Note to U.S.S.G. § 2B1.1(b)(10)(C) defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution

or concealment of an offense . . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . . ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C) note 8(B). Herlihy represented to 1st New Mexico Bank that the truck stop's liquor license was unencumbered by signing a Commercial Security Agreement. See Plea Agreement at 4. Signing a document is not especially complex conduct, as it is a routine part of most business and legal interactions, and it requires no special skill. The Court therefore concludes that the USPO misapplied the 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(9) and sustains Herlihy's Objection 34. See Tr. at 22:10-11 (Coberly); id. at 23:21-24:2 (Court, Sullivan, Tanny).

## X. THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE OFFENSE LEVEL ENCHANCEMENT UNDER U.S.S.G. § 3B1.3 IN PSR ¶ 69, AT 15.

The USPO applies another 2-level enhancement in PSR ¶ 69, at 15, pursuant to U.S.S.G. § 3B1.3 on the theory that Herlihy used his position of private trust as operating manager of the truck stop, and his education and experience as a longtime finance professional, to facilitate the commission of the convicted offense. See PSR ¶ 69, at 15. According to Herlihy, his convicted offense -- making a false statement to 1st New Mexico Bank on a loan application -- involves neither the private trust of his professional position, nor the education and skills of his professional experience. See Objections at 20.

The Application Note to U.S.S.G. § 3B1.3 defines "public or private trust" as "a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 note 1. The Application Note explains that, "[f]or this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment

of the offense." U.S.S.G. § 3B1.3 note 1. By signing a Commercial Security Agreement, Herlihy represented to 1st New Mexico Bank that the truck stop's liquor license was unencumbered. <u>See</u> Plea Agreement at 4. There is no indication that 1st New Mexico Bank selected which documents to have Herlihy sign. There is also no indication that 1st New Mexico Bank gave any unusual deference to Herlihy's representation that the liquor license was unencumbered. The use of a private or public trust, therefore, did not facilitate the signing of the Commercial Security Agreement, and thereby making a false statement to 1st New Mexico Bank.

The Application Note to U.S.S.G. § 3B1.3 then defines "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing," and lists as examples "pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3 note 4. By signing a Commercial Security Agreement, Herlihy represented to 1st New Mexico Bank that the truck stop's liquor license was unencumbered. <u>See</u> Plea Agreement at 4. Signing a document does not require substantial education, training, or licensing, because it is a routine part of most business and legal interactions and requires no special skill. The Court therefore concludes that Herlihy did not use his position of private trust, or his specialized skills, education, or experience as a financial professional, to commission or conceal the convicted offense. Accordingly, the Court also concludes that the USPO erred when it applied the 2-level enhancement pursuant to U.S.S.G. § 3B1.3. The Court therefore sustains Herlihy's Objection 35. <u>See</u> Tr. at 22:11 (Coberly); <u>id.</u> at 23:21-24:2 (Court, Sullivan, Tanny).

## XI. THE COURT SUSTAINS HERLIHY'S OBJECTION THAT THE ADJUSTED OFFENSE LEVEL IN PSR ¶ 71, AT 15, SHOULD BE 7.

Herlihy objects that the adjusted offense level in PSR ¶ 71, at 15, properly should be

calculated as 7 rather than as 33. Objections at 20. Herlihy's base offense level under U.S.S.G. § 2B1.1(a)(1) is 7. See PSR ¶ 64, at 14 (citing U.S.S.G. § 2B1.1(a)(1)). The Court determines supra, parts VII-X, that specific offense characteristics and role in the offense do not add any enhancements to this base offense level. Accordingly, the Court will not apply the 20-level upward adjustment pursuant to U.S.S.G. § 2B1.1(b)(1)(K), the 2-level upward adjustment pursuant to U.S.S.G. § 2B1.1(b)(2)(A), the 2-level upward adjustment pursuant to U.S.S.G. § 2B1.1(b)(9), or the 2-level upward adjustment pursuant to U.S.S.G. § 3B1.3. See Tr. at 22:3-12 (Coberly); id. at 23:21-24:2 (Court, Sullivan, Tanny). The Court therefore concludes that the correctly calculated adjusted offense level in PSR ¶ 71, at 15, should be 7. See Tr. at 23:12-15 (Court, Sullivan, Coberly). The Court accordingly sustains Herlihy's Objection 36.

## XII. THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE DOWNWARD ADJUSTMENT TO THE OFFENSE LEVEL UNDER U.S.S.G. § 3E1.1(b) IN PSR ¶ 74, AT 15.

Herlihy objects to the USPO's application of a 1-level downward adjustment pursuant to U.S.S.G. § 3E1.1(b) on the grounds that it does not apply, because the proper adjusted offense level prior to the operation of § 3E1.1(a) is 7. Objections at 20. The adjustment pursuant to § 3E1.1(b) applies only when "the offense level determined prior to the operation of [§ 3E1.1(a)] is level **16** or greater." U.S.S.G. § 3E1.1(b) (emphasis in original). The Court determines supra, part XI, that the adjusted offense level before the operation of § 3E1.1(a) is 7. The Court therefore concludes that the USPO erred when it applied the 1-level downward adjustment pursuant to U.S.S.G. § 3E1.1(b). The Court accordingly sustains Herlihy's Objection 37. See Tr. at 22:12-13 (Coberly); id. at 23:12-24:1 (Court, Sullivan, Coberly, Tanny).

**XIII.  THE COURT SUSTAINS HERLIHY'S OBJECTION THAT THE TOTAL OFFENSE LEVEL IN PSR ¶ 75, AT 15, SHOULD BE 5.**

Herlihy objects that the total offense level in PSR ¶ 75, at 15, properly should be calculated as 5 rather than as 30.  <u>See</u> Objections at 21.  The Court determines <u>supra</u>, part XI, that the adjusted offense level is 7.  The downward adjustment pursuant to § 3E1.1(a) reduces this level by 2, and no other adjustments apply.  <u>See</u> PSR ¶ 73, at 15.  The Court therefore concludes that the correctly calculated total offense level in PSR ¶ 75, at 15, should be 5.  The Court accordingly sustains Herlihy's Objection 38.  <u>See</u> Tr. at 22:13 (Coberly); <u>id.</u> at 23:12-24:1 (Court, Sullivan, Coberly, Tanny).

**XIV.  THE COURT SUSTAINS HERLIHY'S OBJECTION THAT THE GUIDELINE PROVISIONS IN PSR ¶ 106, AT 24, SHOULD BE CONSISTENT WITH A TOTAL OFFENSE LEVEL OF 5.**

Herlihy objects that the Guidelines provisions in PSR ¶ 106, at 24, should correspond with a total offense level of 5.  <u>See</u> Objections at 21.  The Court determines <u>supra</u>, part XIII, that the total offense level is 5.  Herlihy does not object to the PSR's calculation of his criminal history category of I.  <u>See</u> PSR ¶ 79, at 16.  The Guidelines imprisonment range for a total offense level of 5 and a criminal history category of I is 0 to 6 months.  U.S.S.G. Ch. 5 Pt. A.  The Court therefore concludes that PSR ¶ 106, at 24, should read: "**Guideline Provisions:** Based upon a total offense level of 5 and a criminal history category of I, the Guidelines imprisonment range is 0-6 months." The Court accordingly sustains Herlihy's Objection 39.  <u>See</u> Tr. at 23:3-7 (Coberly); <u>id.</u> at 23:16-24:1 (Court, Coberly, Sullivan, Tanny).

**XV.  THE COURT SUSTAINS HERLIHY'S OBJECTION TO SOME OF THE FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINES SYSTEM.**

Herlihy objects to the first bullet point under the heading "Nature and Circumstances of

the Offense and History and Characteristics of the Defendant" in PSR ¶ 124, at 26,[9] and the first bullet point under the heading "The Kinds of Sentences Available and Sentencing Range Established" in that same paragraph[10] as referring to irrelevant conduct. PSR ¶ 124, at 26. <u>See</u> Objections at 21. The Court determines <u>supra</u>, part I, that only the second loan application with 1st New Mexico Bank falls within the locus of relevant conduct for the convicted offense in this case. The Court therefore concludes that these two bullet points are not relevant and the USPO should remove them. <u>See</u> Tr. at 22:16-24:1 (Coberly, Sullivan, Court, Tanny).

Herlihy also objects that the second bullet point under the heading "The Kinds of Sentences Available and Sentencing Range Established" should be consistent with a total offense level of 5. Objections at 21. The Court determines <u>supra</u>, part XIII, that the total offense level is 5. The Court therefore concludes that the second bullet point[11] under the heading "The Kinds of Sentences Available and Sentencing Range Established" should read: "The defendant entered a guilty plea to the Information. His total offense level is 5, combined with a criminal history category of I, results in a Guidelines imprisonment range of 0 months to 6 months." The Court accordingly sustains Herlihy's Objection 40.

---

[9]This bullet point states: "The instant offense outlined the defendant's involvement in making false representation pertaining to a $16.5 million loan through New Mexico Finance Authority and involvement in a Ponzi-type scheme to defraud dozens of investors, involving approximately $5.5 million in promissory notes." PSR ¶ 124, at 26.

[10]This bullet point states: "Had the defendant been convicted of the Indictment, he would have been subject to a statutory prison term of not more than 30 years imprisonment as to Counts 1 and 5; and not more than 20 years imprisonment as to Counts 2, 3 and 4." PSR ¶ 124, at 26.

[11]This bullet point states: "The defendant entered a guilty plea to the Information. His total offense level is 30, combined with a criminal history category of I, results in a guideline imprisonment range of 97 months to 121 months." PSR ¶ 124, at 26.

## XVI.    THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE IMPOSITION OF A FINE.

Herlihy objects to the imposition of a fine.  See Objections at 21.  Herlihy maintains that his debts exceed his assets and that, with his limited income, he will never realistically be able to pay off his existing liens and debts.  Objections at 21-22.  In the Second Addendum, the USPO replaced the fine with 100 hours of community service.  See Second Addendum at 1.  The Court concludes that this is an acceptable alternative to the fine.  See Tr. at 42:16-18 (Court); id. at 44:10-15 (Court).  The Court accordingly sustains Herlihy's Objection to the imposition of a fine.

## XVII.   THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE SPECIAL CONDITION OF SUPERVISION ON CREDIT CARDS.

Herlihy objects to the first special condition of supervision on page 2 of the Conditions of Supervision.  Herlihy objects that the language -- "You must not incur new credit charges, negotiate or consummate any financial contracts or open additional lines of credit without prior approval of the probation officer" -- is vague, and could be interpreted to mean that he cannot incur additional charges on his existing credit card accounts.  See Objections at 23.  At the sentencing hearing, the USPO stated that it was not opposed to Herlihy being allowed to use credit cards as needed, and the United States agreed with this condition.  See Sentencing Hearing Minutes at 3; Tr. at 25:3-26:16 (Coberly, Court, Tanny, Sullivan).  The Court concludes that this condition should be amended to read: "You must not incur new credit charges (except that you may use current credit cards as needed), negotiate or consummate any financial contracts or open additional lines of credit without prior approval of the probation officer."  The Court therefore sustains Herlihy's Objection to the USPO's proper special condition on credit charges, because it is not

sufficiently specific.  <u>See</u> Tr. at 25:22-26:16 (Court, Coberly, Tanny, Sullivan).

## XVIII.    THE COURT SUSTAINS HERLIHY'S OBJECTION TO THE SPECIAL CONDITION OF SUPERVISION ON TEACHING.

Herlihy objects to the fifth special condition of supervision, which reads: "You must seek approval from the Court regarding employment that involves financial advising or teaching." Conditions of Supervision at 2.  Herlihy objects that the restriction on teaching is unnecessary, because Herlihy currently works as a teacher, and the convicted offense is not related to teaching. <u>See</u> Objections at 23.   Herlihy further objects that it would be more appropriate for him to seek approval from the USPO instead of from the Court for employment that involves financial advising.  <u>See</u> Objections at 23-24.  At the sentencing hearing, the USPO stated that it had no objection to Herlihy teaching.  <u>See</u> Sentencing Hearing Minutes at 3; Tr. at 27:24-28:19 (Tanny, Court, Coberly, Sullivan).  To allow Herlihy to continue with his chosen profession, while ensuring that his teaching does not touch on financial subjects, the Court amends this condition to read: "You must seek approval from the Court regarding employment that involves financial advising, and during the term of supervised release, and must keep the Court advised of any teaching."  At the hearing, the Court did not amend the condition to require Herlihy to seek the USPO's approval regarding financial-advising-related employment.  <u>See</u> Tr. at 43:5-14 (Court, Coberly).  The Court therefore sustains in part Herlihy's Objection to the special condition on teaching, because it is not sufficiently specific.

**IT IS ORDERED** that: (i) the Objections in the Defendant's Objections to Presentence Investigation Report and Request for Evidentiary Hearing, filed July 6, 2017 (Doc. 52), are sustained in part and overruled in part; (ii) the Court will strike the Presentence Investigation Report ¶¶ 11- 50, at 4-12, filed May 1, 2017 (Doc. 46)("PSR"), in their entireties; (iii) the Court

will strike all language in PSR ¶ 51, at 12, that follows "Beckner, Herlihy, and Curtis pledged a liquor license as collateral to obtain the loan."; (iv) the Court will strike all language in PSR ¶ 56, at 13, up to and exclusive of its final two sentences.; (v) the Court will strike PSR ¶ 57, at 13, in its entirety and replace it with the statement of facts in the Plea Agreement, filed February 3, 2017 (Doc. 43), starting at the top of Page 4, going through the last full paragraph of Page 5, taking that exact language, except changing the word "I" to "Herlihy"; (vi) the Court will strike PSR ¶ 65, at 14, which applies the U.S.S.G. § 2B1.1(b)(1)(K) enhancement, in its entirety; (vii) the Court will strike PSR ¶ 66, at 14, which applies the U.S.S.G. § 2B1.1(b)(2)(A) enhancement, in its entirety; (viii) the Court will strike PSR ¶ 67, at 14, which applies the U.S.S.G. § 2B1.1(b)(10)(C) enhancement, in its entirety; (ix) the Court will strike PSR ¶ 69, at 15, which applies the U.S.S.G. § 3B1.3, in its entirety; (x) the Court will change the Adjusted Offense Level in PSR ¶ 71, at 15, to 7; (xi) the Court will strike PSR ¶ 74, at 15, which applies the U.S.S.G. § 3E1.1(b) downward adjustment, in its entirety; (xii) the Court will apply the U.S.S.G. § 3E1.1(a) downward adjustment and change the Total Offense Level in PSR ¶ 75, at 15, to 5;  (xiii) the Court will change PSR ¶ 106, at 24, to read: "**Guideline Provisions:** Based upon a total offense level of 5 and a criminal history category of I, the guideline imprisonment range is 0-6 months"; (xiv) the Court will strike the first bullet point under the heading "Nature and Circumstances of the Offense and History and Characteristics of the Defendant" in PSR ¶ 124, at 26, and the first bullet point under the heading "The Kinds of Sentences Available and Sentencing Range Established" in that same paragraph; (xv) the Court will change the second bullet point under the heading "The Kinds of Sentences Available and Sentencing Range Established" to read: "The defendant entered a guilty plea to the Information.  His total offense level is 5, combined with a criminal history

category of I, results in a Guidelines imprisonment range of 0 months to 6 months"; (xvi) the Court will impose 100 hours of community service in place of a fine; (xvii) the Court will change the special condition of supervision dealing with credit charges in Page 2 of Conditions of Supervision to read: "You must not incur new credit charges (except that you may use current credit cards as needed), negotiate or consummate any financial contracts or open additional lines of credit without prior approval of the probation officer"; (xviii) the Court will change the special condition of supervision dealing with teaching in Page 2 of Conditions of Supervision to read "You must seek approval from the Court regarding employment that involves financial advising, and during the term of supervised release, must keep the Court advised of any teaching"; (xix) the Court overrules Herlihy's Objection to the characterization of the loan from Maurice Bonal in PSR ¶¶ 53-54, at 12; (xx) the Court will accept the Plea Agreement under rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure; and (xxi) after considering the factors in 18 U.S.C. § 3553(a), and the Guidelines sentencing range of 0 to 6 months, the Court will assign Herlihy a within-Guidelines sentence of 1 day or time served, whichever is less, followed by a term of supervised release for 3 years, during which Herlihy must not incur new credit charges (except that he may use current credit cards as needed), negotiate or consummate any financial contracts or open additional lines of credit without prior approval of the probation officer, must provide the probation officer access to any requested financial information and authorize the release of any financial information, must not communicate or otherwise interact with co-conspirators, must complete 100 hours of community service during the first year of supervised release, must file timely, accurate and lawful income tax returns and provide proof of such filing to the probation officer as requested, and must seek approval from the Court regarding employment that involves financial advising and, during

the term of supervised release, must keep the Court advised of any teaching.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
   United States Attorney
Sean J. Sullivan
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Todd A. Coberly
Coberly Law Office
Santa Fe, New Mexico

     *Attorneys for the Defendant*